## COMMONWEALTH *vs.* SEAN DWYER.

Norfolk. April 4, 2006. - December 29, 2006.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Privileged Communication. Evidence,* Privileged communication, Exculpatory, Prior misconduct, Relevancy and materiality, Admissions and confessions, Impeachment of credibility, Hearsay, Failure to produce witness, Medical record. *Witness,* Impeachment, Unavailability. *Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Assistance of counsel, New trial, Subpoena. *Due Process of Law,* Access to evidence. *Rape-Shield Statute. Subpoena. Rules of Criminal Procedure.*

The combination of a number of errors at the trial of indictments for rape of a child by force and indecent assault and battery on a child under fourteen years required that the defendant be granted a new trial, where the judge abused her discretion in allowing the complainant to testify in detail about prior alleged but uncharged incidents of sexual abuse, which testimony overwhelmed the evidence of the two charged incidents [127-130]; where the judge erred in allowing the prosecutor to use, in impeaching the defendant, a nontestifying codefendant's involuntary confession [130-132]; and where defense counsel was ineffective in making a promise to a jury about anticipated testimony from a witness that he had not interviewed, and whom he subsequently did not call to testify, and then compounded the error by failing to challenge effectively the Commonwealth's attempt to capitalize on the error [133-136], and was ineffective in agreeing to the admission of a physician's unredacted report that contained highly prejudicial hearsay evidence [136-139].

In light of recent developments in jurisprudence and continuing concerns about potential constitutional infirmities of some aspects of the protocols established by *Commonwealth* v. *Fuller,* 423 Mass. 216 (1996), and *Commonwealth* v. *Bishop,* 416 Mass. 169 (1993), applicable to pretrial requests by defendants for statutorily privileged records from nonparties in criminal cases, this court announced a new protocol providing for a reasonable opportunity for defense counsel (and only defense counsel in the first instance) to inspect before trial presumptively privileged records produced by a third party, subject to a stringent protective order. [139-147]

INDICTMENTS found and returned in the Superior Court Department on November 14, 2001.

The cases were tried before *Barbara A. Dortch-Okara,* J., and a motion for a new trial, filed on December 14, 2004, was considered by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Carlene A. Pennell* for the defendant.

*Varsha Kukafka,* Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Andrew N. Nathanson, Philip J. Catanzano, Helen Gerostathos Guyton, John B. Koss, Noah C. Shaw, Susan M. Finegan, & Kathryn M. Reardon* for Victim Rights Law Center & others.

*Carol A. Donovan, Sarah Wunsch, & Anne Goldbach* for Committee for Public Counsel Services & others.

*Wendy J. Murphy* for Victim Advocacy and Research Group & another.

*Daniel F. Conley,* District Attorney, & *John P. Zanini,* Assistant District Attorney, *Martha Coakley,* District Attorney, *Michael O'Keefe,* District Attorney, *Timothy J. Cruz,* District Attorney, & *Jonathan W. Blodgett,* District Attorney, for District Attorney for the Suffolk District & others.

BY THE COURT. This appeal causes us to reconsider the protocols established by *Commonwealth* v. *Fuller,* 423 Mass. 216 (1996) (*Fuller*), and *Commonwealth* v. *Bishop,* 416 Mass. 169 (1993) (*Bishop*), which govern a defendant's pretrial access to statutorily privileged records of witnesses in criminal cases. The defendant was convicted by a jury of rape of a child by force, G. L. c. 265, § 22A, and indecent assault and battery on a child under fourteen years, G. L. c. 265, § 13B. Among several challenges to his convictions, he claims that the denial of his repeated requests to review the complainant's therapy records was an abuse of discretion, and that the *Bishop-Fuller* protocols impose an unconstitutionally high burden on defendants, leading to the unavailability of exculpatory evidence and depriving defendants of their constitutional right to a fair trial. The defendant also asserts that the trial judge abused her discretion by admitting in evidence the complainant's detailed testimony of prior alleged but uncharged sexual assaults by the defendant; that he was denied his rights of due process and confrontation when the prosecutor cross-examined him about a nontestifying codefendant's confession that had been suppressed prior to trial; that his trial counsel was

ineffective in several respects; and that the judge abused her discretion in denying his motion for a new trial without a hearing. We granted the defendant's application for direct appellate review.

For the reasons we explain below, we conclude that a number of errors at trial, in combination, require that we grant the defendant a new trial. As to the defendant's challenge to the *Bishop-Fuller* protocols, we announce today a new protocol governing a defendant's request to inspect statutorily privileged records of any third party. The new protocol, which replaces the *Bishop-Fuller* protocol, is not constitutionally compelled, and shall apply prospectively to all criminal cases tried after the issuance of the rescript in this case. Because the defendant is to receive a new trial, he shall have the benefit of the new protocol. We therefore do not consider his challenge to the rulings on his requests for access to the complainant's therapy records.[1]

We turn first to the facts of this case. We then address the alleged errors at trial. Last, as described in more detail in the Appendix to this opinion, we outline the protocol applicable to pretrial requests for documents from nonparties in all criminal cases.

1. *Factual background.* In February, 2001, when the complainant was sixteen years old, she told her boy friend and then her parents that two of her cousins, the defendant and Frederick Lomberto, both four years older than the complainant, had raped and sexually assaulted her over a period of several years beginning in 1992 or 1993 when she was eight or nine

---

[1]In *Commonwealth* v. *Pelosi*, 441 Mass. 257, 258-159 n.1 (2004), we announced the formation of a committee to "study and present to the court alternatives to the [*Bishop-Fuller*] protocol regarding defense access to privileged records in sexual assault cases." On January 20, 2006, the committee submitted its report to the Supreme Judicial Court. The committee did not reach a consensus as to any one alternative to the *Bishop-Fuller* protocols. We acknowledge the substantial contribution of the committee members.

We also acknowledge the amicus briefs of the Victim Advocacy Research Group and the Leadership Council on Child Abuse and Interpersonal Violence; the Committee for Public Counsel Services, the Massachusetts Association of Criminal Defense Lawyers, and the American Civil Liberties Union of Massachusetts; the Victim Rights Law Center, Boston Area Rape Crisis Center, Massachusetts Office for Victim Assistance, Jane Doe, Inc., Domestic Violence Council, Inc., and Domestic Violence Institute; and the District Attorneys for the Suffolk, Northern, Eastern, Cape and Islands, and Plymouth districts.

years old.[2] On the evening she made these statements, the complainant attempted suicide. Her parents took her to Milford Hospital, where she was treated and released the following morning.

In March and April, 2001, the complainant met with several therapists, including a psychiatrist and a social worker, and underwent a psychiatric evaluation at Pembroke Hospital. She also received counselling at Wayside Counseling Center. After expressing suicidal thoughts to her boyfriend, she met with her high school guidance counsellor, who in April, 2001, filed what appears to be the first report of suspected abuse pursuant to G. L. c. 119, § 51A.

In May, 2001, the complainant underwent the first of two sexual abuse intervention network (SAIN) interviews.[3] In the first SAIN interview conducted at the Milford police department, the complainant stated that abuse by the defendant and Lomberto had commenced when she was eight or nine years old and stopped when she was thirteen years old. She described several specific instances that she said had occurred when she was nine or ten years old, and stated that the defendant had raped or sexually assaulted her "almost fifty times." Thereafter, in June, 2001, a physician conducted a child protection evaluation and physical examination of the complainant at the University of Massachusetts Memorial Medical Center.

In the second SAIN interview, conducted at the Bellingham police department in July, 2001, the complainant was questioned about a handwritten list she had prepared of alleged incidents of

---

[2] The defendant and Lomberto are respectively the sons of two maternal aunts of the complainant. Lomberto was indicted at the same time as the defendant. Initially the two cousins were codefendants. Their trials were subsequently severed. Lomberto's first trial, which followed the defendant's, ended in a mistrial. Lomberto was subsequently convicted of rape of a child by force and indecent assault and battery on a child under fourteen years.

[3] A sexual abuse intervention network (SAIN) interview "represents an effort to reduce the burden on a young abuse complainant. When a SAIN interview is conducted, members of several different agencies may be present. Normally, representatives of one or more agencies interview the child, while the representatives of other agencies watch from behind a mirrored window." *Commonwealth* v. *Lam*, 444 Mass. 224, 227 n.4 (2005). See *Commonwealth* v. *Howell*, 57 Mass. App. Ct. 716, 718 n.2 (2003) (SAIN interview "spares a child complainant from undergoing repeated questioning regarding sensitive matters related to ascertaining whether sexual abuse has occurred").

sexual abuse by the defendant and Lomberto beginning in June, 1992, and ending in September, 1997. Among other incidents, the complainant described two rapes by the defendant in the summer of 1997. She said one had taken place at her home in July, 1997, one week before her thirteenth birthday; the second had taken place, she said, in the basement of her grandparents' house during a yard sale in August, 1997. These allegations served as the basis for two sets of indictments against the defendant, charging him with rape of a child by force and indecent assault and battery on a child under fourteen years.[4],[5]

2. *Procedural background.* In May, 2003, the defendant's motion for severance from his codefendant Lomberto was allowed. Before the cases were severed, the defendant and Lomberto filed several joint motions seeking access to the complainant's therapy records in accordance with the procedures set forth in *Bishop, supra* at 179-183. Two judges in the Superior Court denied the motions, concluding that the defendants had not demonstrated a sufficient basis for ordering in camera review of the records.[6] Their motion for reconsideration was denied.

---

[4]The defendant turned seventeen years old on June 10, 1997, and was therefore charged as an adult. See G. L. c. 218, § 60 (Juvenile Court department has exclusive jurisdiction of "juvenile offenders under age seventeen"). See also *Commonwealth v. Ulysses H.*, 52 Mass. App. Ct. 497, 499-500 & n.5 (2001) (offense committed prior to seventeenth birthday meets prerequisite to youthful offender indictment under G. L. c. 119, § 54 and § 72 [a], second par.; "once having attained the age of seventeen . . . the offender may be tried as an adult").

[5]In November, 2001, the defendant was charged in Norfolk County with one indictment charging rape of a child by force and two indictments charging indecent assault and battery on a child under fourteen years as to the August, 1997, incident. The following month, he was charged in Worcester County with one indictment charging rape of a child by force and one indictment charging indecent assault and battery on a child under fourteen years as to the July, 1997, incident. On May 10, 2002, the Worcester County indictments were consolidated with the Norfolk County indictments.

[6]The first motion judge determined that certain records were privileged and that the defendants had not made a sufficient showing of relevancy to warrant in camera review of those records. As to the remainder of the records, he suggested that they "may be relevant" but "reserve[d] [his] decisions about relevancy and privilege" and ordered the record holders of the materials sought to assert any claim of privilege. Claims of privilege were then asserted with respect to some of the records. After a second hearing, a different judge determined that some were privileged and that the defendants had not

The defendant's trial commenced on January 9, 2004; the jury deliberated for three days, and returned guilty verdicts on the indictments relating to the August, 1997, incident only. Because the jury failed to agree on a verdict on the indictments relating to the July, 1997, incident, the judge declared a mistrial as to those indictments.

Lomberto's trial commenced on January 21, 2004, immediately following the conclusion of the defendant's trial. When the jury could not reach verdicts on any of the eleven charges, the judge declared a mistrial. Before his retrial, Lomberto filed a renewed *Bishop* motion for access to the therapy records of the complainant. A different judge in the Superior Court allowed the motion, ordered all of the complainant's therapy records produced for in camera review, and subsequently permitted Lomberto and his counsel to review and copy certain records.[7] In September, 2004, a jury returned guilty verdicts against Lomberto on two of the rape charges and three of the indecent assault and battery charges and verdicts of not guilty on four of the rape charges and two of the indecent assault and battery charges.

In December, 2004, the defendant's counsel filed a motion for a new trial, arguing among other things that the denial of access to the records had deprived the defendant of a "viable defense to the charged offenses" because the redacted records introduced at Lomberto's second trial reflect that the complainant "repeatedly and consistently reported" that the alleged abuse occurred several years before the defendant turned seventeen years old, and "directly contradict" the complainant's testimony at the defendant's trial that the alleged abuse had occurred in July and August of 1997. See note 5, *supra*. The judge denied the defendant's motion for a new trial without a hearing. The defendant's appeal from that ruling was consolidated with his direct appeal.

3. *Prior bad acts.* At the defendant's trial the complainant, who was then nineteen years old, testified first about the two

---

"demonstrated a sufficient basis for ordering the production and in camera review of these records." Nonprivileged records were ordered produced.

[7] Redacted copies of certain records were later introduced in evidence at Lomberto's second trial.

charged incidents, which allegedly occurred in July and August, 1997. Following this testimony, the prosecutor asked the complainant to "estimate" how many times the defendant had "touched [her] in a sexual way" before August, 1997. The complainant responded, "Uncountable." After the judge gave a limiting instruction,[8] the prosecutor proceeded to question the complainant about seven different incidents of uncharged sexual abuse that allegedly had occurred before 1997, each of which the complainant described in detail.

The defendant contends that the judge abused her discretion in allowing the complainant to testify in such detail about the unindicted incidents and that this testimony "overwhelmed" the evidence of the two incidents with which the defendant was charged. We agree. The jury heard more about uncharged sexual assaults than they did about the crimes charged. Of the sixty-five transcript pages of the complainant's direct testimony, fifteen pages covered the July and August, 1997, incidents, while twenty-one pages contained testimony of the uncharged assaults. Trial counsel's cross-examination of the complainant, in turn, was directed primarily at discrediting her testimony of the uncharged conduct. Later, much of the defendant's own testimony was devoted to denying the uncharged prior bad acts.

It is long established that evidence of uncharged criminal acts or other misbehavior is not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as "common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive." *Commonwealth* v. *Marshall*, 434 Mass. 358, 366 (2001), quoting *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). In sexual assault cases, some evidence of uncharged conduct may be admissible to give the jury a view of the entire relationship between the defendant

---

[8]The judge cautioned the jury that "the defendant is only charged with the indictments that were read to you by the clerk[,] [t]he matters concerned with 1997. The evidence that you hear about previous misbehavior or bad acts is admitted for the purpose of providing you with some evidence of the complaining witness's state of mind . . . . Also, that evidence may be considered on the issue of the . . . modus operandi or the course of conduct of the defendant, to the extent that you choose to believe that evidence."

and the alleged victim, and "the probative existence of the same passion or emotion at the time in issue." *Commonwealth v. Barrett*, 418 Mass. 788, 794 (1994), quoting *Commonwealth v. King*, 387 Mass. 464, 470 (1982). It is left to the judge to determine whether such evidence has probative value and, if so, whether its probative value outweighs the risk of undue prejudice to the defendant. See *Commonwealth v. Barrett, supra* at 794-795; *Commonwealth v. Helfant, supra* at 225.

Some testimony by the complainant concerning the rapes and sexual assaults by the defendant spanning several years was probative of the relationship between the defendant and the complainant. *Commonwealth v. Barrett, supra* at 794. But even if relevant, a judge must guard against the risk that evidence of prior bad acts will divert the jury's attention from the charged acts. See *Commonwealth v. Baker*, 440 Mass. 519, 530 (2003). Here, the jury's attention was repeatedly drawn to the uncharged conduct. In his closing argument, the prosecutor emphasized for the jury the complainant's testimony about "an ongoing basis of sexual assault" and suggested that her testimony was credible in part because it was "extremely detailed," recounting "years of abuse."

The Commonwealth argues that the judge's limiting instructions were sufficient to cure any prejudice, and points to the judge's subsequent ruling that the jury's split verdict demonstrates that the jury were "not overwhelmed or inflamed against the defendant." In the circumstances of this case, however, we conclude that the defendant has shown the requisite prejudice. See *Commonwealth v. Barrett, supra* at 795 ("It is implicit in the general rule regarding the inadmissibility of prior bad acts evidence that the admission of such evidence carries with it a high risk of prejudice to the defendant"). Allowing the complainant to testify in detail about each of seven uncharged incidents was excessive. The judge should have intervened to prevent the "danger of overwhelming a case with such bad act evidence." *Commonwealth v. Roche*, 44 Mass. App. Ct. 372, 380 (1998) (noting judge's obligation to guard against this danger). It was not, as the judge later recognized, that the defendant suffered "some prejudice by virtue of this evidence," but that the prejudice was overwhelming. At a new trial the

judge should take care to limit any prior bad act testimony to establishing in summary fashion that the complainant claims that the abuse continued over a number of years.

4. *Use of Lomberto's admission at the defendant's trial.* In May, 2001, several months after she first made the allegations of the sexual abuse by her two cousins, the complainant's father interrogated Lomberto, during which Lomberto admitted to the complainant's allegations. The father had videotaped the interrogation.[9] A judge in the Superior Court later concluded that the admission had been coerced and ordered it suppressed at Lomberto's trial. At trial, the defendant denied all allegations that he had sexually abused the complainant. Toward the end of his direct testimony, his counsel asked whether he had "any knowledge" that Lomberto had raped the complainant, to which the defendant replied, "No, never."

On cross-examination the prosecutor attempted to impeach this statement by showing that the defendant knew of Lomberto's videotaped admissions. The judge ruled that the suppressed admissions could not be introduced, but allowed the prosecutor to refer to the admissions to impeach the defendant. In the ensuing examination, which is reproduced in the margin, the prosecutor elicited from the defendant an admission to the effect that he knew that Lomberto had been "forced" to admit that he had sexually abused the complainant.[10] The judge im-

---

[9] The record does not disclose what, if anything, Lomberto said about the defendant on the videotape.

[10] THE PROSECUTOR: "And in that conversation [in May, 2001] he made you aware that he . . . Lomberto, had admitted his role; isn't that true?"

THE DEFENDANT: "He admitted to me that . . . the accusations were there, but he never said he admitted anything."

DEFENSE COUNSEL: "Your Honor, objection."

THE JUDGE: "Overruled."

THE PROSECUTOR: "He never told you in that conversation that he had told somebody that it was true, what [the complainant] had said about him?"

THE DEFENDANT: "He said that he was forced to, yes."

DEFENSE COUNSEL: "Your Honor, objection."

THE JUDGE: "Overruled, sir."

THE PROSECUTOR: "So now you're stating that he admitted to you that he told someone and he also told you that he was forced to say it?"

THE DEFENDANT: "That's true."

mediately gave a limiting instruction that any evidence of Lomberto's role in the crimes charged could not be used against the defendant. Lomberto was, of course, not a witness at the defendant's trial.

The defendant challenges the judge's ruling on the use of Lomberto's coerced admission on grounds both constitutional (right to confrontation and due process) and nonconstitutional (Lomberto's admission was involuntary and therefore unreliable and was not true impeachment material). As to his constitutional claims, the defendant relies in part on *Bruton* v. *United States*, 391 U.S. 123 (1968). That reliance is misplaced. The defendant and Lomberto were not tried jointly, see *Commonwealth* v. *Adams*, 416 Mass. 55, 57-58 (1993) (*Bruton* rule applies only at joint trial), and the defendant's testimony about Lomberto's admission did not explicitly implicate the defendant. See *Commonwealth* v. *James*, 424 Mass. 770, 782 (1997), quoting *Richardson* v. *Marsh*, 481 U.S. 200, 208 (1987) (*Bruton* rule limited to "cases where the codefendant's statement 'expressly implicate[s]' the defendant, leaving no doubt that it would prove to be 'powerfully incriminating' "). Nevertheless, the defendant should not have been questioned about Lomberto's admission.

The connection between the defendant and Lomberto permeated the trial. It informed the prosecutor's opening statement, and the complainant repeatedly testified about sexual abuse by her "cousins" or by "Sean and Fred." Defense counsel's repeated objections to evidence associating the defendant with Lomberto were overruled. Moreover, as the defendant points out, although the judge gave a limiting instruction, the judge did not instruct the jury that Lomberto's admission had been coerced, which compounded the potential prejudice to the defendant.[11] See *Commonwealth* v. *James*, *supra* at 783 ("contextual incrimination" occurs "where the circumstances of the case and the nature of the codefendant's statement so obviously implicate the defendant in the crime itself as virtually to

---

[11]The defendant's own testimony that Lomberto had been "forced" was not sufficient to inform the jury that Lomberto's admissions had been coerced.

constitute direct incrimination"). The judge's limiting instruction did not effectively counteract the prejudice.

Furthermore, the rationale underlying our cases interpreting *Bruton* applies with some force to the prosecution's use of Lomberto's involuntary admission to impeach the defendant. A defendant's own involuntary admission may not be used to impeach him. See *Commonwealth* v. *Kleciak*, 350 Mass. 679, 689-690 (1966). If the contextual incrimination from the use of a codefendant's admission is strong enough, it can — and here it did — undermine the effect of a judge's limiting instruction such that the use of the coerced admission becomes inherently unfair. Cf. *Commonwealth* v. *Blake*, 428 Mass. 57, 60 (1998); *Commonwealth* v. *Rosa*, 412 Mass. 147, 161-163 (1992), citing *LaFrance* v. *Bohlinger*, 499 F.2d 29 (1st Cir.), cert. denied sub nom. *Meachum* v. *LaFrance*, 419 U.S. 1080 (1974) (if wife's decision to waive spousal privilege and testify at husband's first trial was not voluntary, then use of her prior recorded testimony at husband's second trial "offends fundamental fairness"); *LaFrance* v. *Bohlinger, supra* at 35-36 (due process clause prohibits use of defense witness's coerced statement to impeach witness).

As to the nonconstitutional claims, Lomberto's admission was not true impeachment material and should not have been admitted for that purpose. The defendant denied any knowledge that Lomberto had sexually abused the complainant. The prosecutor then used Lomberto's admission to elicit from the defendant an admission that he knew that Lomberto had been forced to confess to the crimes. This was not inconsistent with the defendant's testimony. The coerced admissions are unreliable hearsay not relevant to the question whether the defendant had committed the charged acts. See *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989), quoting *Commonwealth* v. *Chretian*, 383 Mass. 123, 136 (1981) (relevant evidence has "rational tendency to prove an issue in the case"). See also *Commonwealth* v. *Kleciak, supra* at 690 ("an involuntary confession does not become any more trustworthy . . . because the confession is used to impeach the credibility of the defendant rather than as substantive evidence").

5. *Ineffective assistance of counsel.* The defendant claims that his trial counsel was ineffective in several respects, of which we address two. First, in his opening statement counsel promised exculpatory testimony from a witness, Daniel LaBonte. But counsel had never spoken to LaBonte. That ineffectiveness was compounded, the defendant argues, when the prosecutor sought and the judge gave a missing witness instruction when defense counsel later decided not to call LaBonte to testify.

Second, he says, counsel agreed to the admission of an unredacted written report by a physician, who performed a child protection evaluation and physical examination of the complainant, which contained inadmissible hearsay. We examine the defendant's claims under the familiar standard to determine "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer," *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974) (*Saferian*), and, if so, "whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Id.*

a. *Missing witness instruction.* We conclude that the defendant has satisfied both prongs of the *Saferian* standard with respect to this claim. Defense counsel told the jury in his opening statement that LaBonte and another witness, Doug Wiebers, would testify that they were with the defendant at his grandparents' yard sale on the day of the second alleged rape in August, 1997, and that the defendant had not entered his grandparents' house as the complainant had asserted. Wiebers did testify to those facts. But when LaBonte arrived at the court house, he explained to defense counsel (who had not previously interviewed him) that he had no memory of driving to the defendant's grandparents' house during a yard sale in August, 1997, seven years earlier. As a result, defense counsel decided not to call LaBonte.

On cross-examination the prosecutor's first question to the defendant was, "Who is Daniel LaBonte?" When defense counsel objected to the question, the prosecutor explained at

sidebar that he was "laying the foundation" for a missing witness instruction, which the judge later allowed over defense counsel's objection.[12] In his closing argument, the prosecutor drew the jury's attention to defense counsel's promise in his opening statement that LaBonte would testify that he was with the defendant "on that day" in August, 1997, and that counsel had failed to deliver on his promise. As requested, the judge gave a missing witness instruction during her final charge to the jury, permitting the jury to draw a negative inference against the defendant because LaBonte had not testified as defense counsel had promised.[13]

It is fundamental that counsel should not make a promise to a jury about anticipated testimony from a witness he has not interviewed. Cf. *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. 111, 122 (1998) ("Defense counsel failed to meet a minimum standard of performance by announcing to the jury that the defendant might testify without first having met with him to discuss that possibility and to prepare him for it"). That error was compounded when defense counsel failed to challenge effectively the Commonwealth's attempt to capitalize on the error. Had defense counsel explained to the judge that he did not call LaBonte to testify because LaBonte did not remember the events

[12]The basis of defense counsel's objection was that "there is no testimony given by this LaBonte and this is an attempt to . . . cast [aspersions] on the defendant because his friend isn't here testifying. There could be many reasons."

[13]The judge instructed, in pertinent part: "Jurors, during the course of this trial, you have heard some testimony that referred to a potential witness. I believe Mr. Dan LaBonte — and of course your memory controls — is the potential witness that you heard testimony concerning. The potential witness did not testify before you. As I have already instructed you, the general rule is that in reaching your verdict, you may only consider the evidence that was presented to you in court. However, under certain circumstances, you may also consider the fact that a potential witness did not testify. Where a party has knowledge of a person who can be located and brought forth who is friendly to or at least not hostile to that party and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness.

"If then, without explanation, the defendant does not do so, you are free to, but not require[d] to, infer that the witness, had he been called, would have given testimony unfavorable to that party."

of seven years earlier, the judge likely would not have given a missing witness instruction. See *Commonwealth* v. *Zagranski,* 408 Mass. 278, 287 (1990) (jury can only draw negative inference from failure to call witness if, among other things, "the witness's absence [is] not explained in the circumstances of the case"); *Commonwealth* v. *Gagliardi,* 29 Mass. App. Ct. 225, 244 (1990) (judge should decline to give missing witness instruction if given plausible reason for nonproduction of witness). See also *Commonwealth* v. *Tripolone,* 57 Mass. App. Ct. 901, 902-903 (2003) (judge properly declined to give missing witness instruction where among other things witness likely would not remember more precisely than other witnesses events that occurred seven years earlier).

The prosecutor's focus on LaBonte's absence had an obvious impact on the jury. On the first day of their deliberations, the jury sent the judge a question concerning LaBonte's absence and asked whether the Commonwealth could have summonsed LaBonte.[14] In response the judge stated: "Mr. LaBonte was designated as a defense witness. You may not speculate as to why the Commonwealth, the prosecution did not call him as a witness, and you may not consider the fact that the prosecution did not call him in your deliberations at all." The judge's response, although correct, placed any negative inference from LaBonte's absence solely at the feet of the defendant. It is noteworthy that the jury returned guilty verdicts on the August, 1997, indictments only. Had LaBonte not been mentioned, the jury might have accepted Wiebers's version of events of August, 1997. Defense counsel's initial error, combined with the missing witness instruction, was "decisive." *Commonwealth* v. *Franklin,* 366 Mass. 284, 294 (1974). See *Commonwealth* v. *Ortiz,* 61 Mass. App. Ct. 468, 473 (2004) (reversing conviction where defendant advanced alibi defense and judge gave missing witness instruction regarding potential alibi witness; inference argued by prosecutor and reinforced by missing witness instruc-

---

[14]"Was Dan LaBonte — once Dan LaBonte did not show up as a witness for the defense, was the prosecution allowed to call him and compel him to appear at the end of the trial? If yes, can we consider this in our deliberations?"

tion to jury "unfairly encouraged the jury to weigh [the witness's] absence heavily against the defendant").[15]

b. *Admission of unredacted medical report.* Defense counsel agreed to the admission of a physician's unredacted report of the child protection evaluation and physical examination she conducted of the complainant in June, 2001. The defendant claims this amounted to ineffective assistance because the report contained highly prejudicial hearsay evidence.[16] We agree.

The statute establishing the medical records exception to the hearsay rule "is not to be interpreted as rendering admissible all the contents of hospital records," *Bouchie* v. *Murray*, 376 Mass. 524, 528 (1978); rather it makes admissible only those portions of records relating to "treatment and medical history." G. L. c. 233, § 79. See *Doyle* v. *Dong*, 412 Mass. 682, 684 (1992). The majority of the report related to the treatment and medical history of the complainant. The report did, however, contain hearsay statements concerning the complainant's sister, which

---

[15]The defendant also contends that his trial counsel was ineffective because he did not call two "key alibi witnesses," Mary Lomberto and Joseph Lomberto, the mother and brother of Frederick Lomberto, who would have testified that they were at the yard sale in August, 1997, and that the defendant never entered his grandparents' house where the complainant alleged the rape by the defendant had occurred. The decision not to call these two witnesses was not "manifestly unreasonable." *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). The witnesses' testimony would have been cumulative of Wiebers's testimony, and coming from relatives of the defendant could have appeared to the jury to be biased. See *Commonwealth* v. *Thomas*, 429 Mass. 146, 153 (1999) (testimony of relative of defendant is "inherently less credible than the testimony of other witnesses").

[16]The defendant also argues that the physician's report does not fall within the hospital record exception to the hearsay rule, G. L. c. 233, § 79, because the complainant was "sent to [the physician] by the District Attorney's office . . . presumably to gather evidence in a criminal prosecution," and there is no evidence that [the physician] "stressed upon" the complainant the need to be truthful and accurate. He contends that the report would have been excluded from evidence had defense counsel objected. The argument is unavailing. The defendant relies on the complainant's testimony at Lomberto's second trial that she had a "pelvic exam" after the district attorney became involved "because they told me that I had to go, that it was just standard procedure, that all rape victims had to go." Lomberto's trial occurred after the defendant's, and we do not view trial counsel's decision "with the advantage of hindsight." *Commonwealth* v. *Adams*, *supra* at 729. As to his second argument, the admissibility of hospital records is not premised on proof of warnings to patients to be honest and accurate. See G. L. c. 233, § 79; *Commonwealth* v. *Dube*, 413 Mass. 570, 573 (1992) (G. L. c. 233, § 79, has been interpreted liberally).

implied that she, too, might have been abused, inferentially by the defendant and Lomberto. These statements should have been redacted.

The report also included statements bearing on the question of liability that should have been redacted.[17,18] See G. L. c. 233, § 79 (contents of hospital record referring to "question of liability" not admissible). Although a hospital record relating to treatment and medical history may be admitted "even though incidentally the facts recorded may have some bearing on the question of liability," *Commonwealth* v. *Concepcion*, 362 Mass. 653, 656 (1972), quoting *Cowan* v. *McDonnell*, 330 Mass. 148, 149 (1953), ultimate conclusions concerning the charged crimes should be redacted. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 241-242 (1998) (notations on hospital intake form stating that complainant had been "assaulted" should have been redacted); *Commonwealth* v. *Baldwin*, 24 Mass. App. Ct. 200, 202-203 (1987) (admission of so much of hospital record that contained "diagnosis" of "sexual molestation" was error entitling defendant to new trial).

Counsel's decisions will not be viewed as constituting ineffective assistance unless they are "manifestly unreasonable." *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). See *Commonwealth* v. *White*, 409 Mass. 266, 273 (1991). The Commonwealth argues that defense counsel's decision to agree to admission of the report was not manifestly unreasonable because he had a tactical reason for doing so: to ask the physician about

---

[17]The report stated that the complainant had "disclosed sexual abuse . . . by two cousins who are identified as Fred Lomberto and [the defendant]," that the "alleged perpetrators are male cousins of this child identified as [the defendant] . . . [and] Freddie Lomberto," and that the complainant had given "a clear and consistent disclosure of multiple incidents of sexual abuse . . . by her two male cousins that have been identified as [the defendant] and Freddie Lomberto." It also stated that the complainant's mother told the physician that the complainant had disclosed to her mother "that she had been raped . . . by her two male cousins."

[18]The defendant asserts that these same statements could not have been admitted as fresh complaint evidence. The Commonwealth conceded at a pretrial hearing that the complainant's allegations made four years after the last incident of alleged abuse were not admissible as fresh complaint evidence. The "fresh complaint" doctrine has been substantially revised and is now designated the "first complaint" doctrine. *Commonwealth* v. *King*, 445 Mass. 217, 241-242 (2005).

other sexual relationships that the complainant may have had that could have caused tissue scarring noted by the physician in her report. The defendant counters that his trial counsel could have cross-examined the physician about the tissue scarring without admitting the entire report in evidence. Had defense counsel complied with the procedural requirements of the rape-shield statute, G. L. c. 233, § 21B, he likely would have been permitted to question the physician on this issue.[19] See *id.* ("Evidence of specific instances of a victim's sexual conduct . . . shall not be admissible except . . . evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim"). See also *Commonwealth* v. *Cortez*, 438 Mass. 123, 129 (2002); *Commonwealth* v. *Cardoza*, 29 Mass. App. Ct. 645, 648-649 (1990). Admission of the entire report was not necessary to the defense strategy. Defense counsel should have moved to redact the hearsay statements concerning the complainant's sister and the statements naming the defendant and Lomberto as the perpetrators of the sexual abuse.

6. *Relief for errors at trial.* In the preceding sections we have identified several errors that occurred at the defendant's trial. We have not considered whether any single error is sufficient to warrant reversal of the convictions because we conclude that the combination of errors requires that we grant the defendant a new trial. See *Commonwealth* v. *Cancel*, 394 Mass. 567, 576 (1985), quoting *Commonwealth* v. *Wood*, 380 Mass. 545, 550 (1980) (although errors taken individually not sufficiently prejudicial to require reversal of conviction, combination of errors resulted in substantial risk of miscarriage of justice, where court had "serious doubt as to whether this defendant was [unduly] prejudiced" by combination of errors); *Commonwealth* v. *Mazzone*, 55 Mass. App. Ct. 345, 353 (2002), quoting *Commonwealth* v. *Mills*, 47 Mass. App. Ct. 500, 507 (1999) ("While each error in isolation might not have required reversal, we conclude that the cumulative errors 'fatally infected the judg-

---

[19]During a pretrial discussion of the agreement to admit the physician's unredacted report, the judge noted that "in the report, she does ask [the complainant] about prior consensual sexual contact" and recognized the need for a "rape shield motion."

ment of conviction' "); *Commonwealth* v. *Kines,* 37 Mass. App.
Ct. 540, 542, 543-544 (1994) (new trial required where case
turned largely on credibility of witnesses, and combination of
errors "created a risk that the evidence may not have been
weighed in an unbiased manner").

7. *Protocol for pretrial inspection of third-party records.* As
noted earlier, the defendant challenges the denial of his pretrial
and posttrial motions to review the complainant's treatment rec-
ords. He also raises a constitutional challenge to the *Bishop-
Fuller* protocols: having reviewed the complainant's treatment
records introduced at Lomberto's second trial, he asserts that
adherence to the *Bishop-Fuller* protocols denied him a "viable
defense" to the crimes for which he was indicted. We need not
address his arguments because, in light of recent developments
in our jurisprudence and continuing concerns about potential
constitutional infirmities of some aspects of the *Bishop-Fuller*
protocols, we announce today a new protocol that shall apply in
every criminal case (the protocol is not limited to sexual assault
cases) where a defendant seeks pretrial inspection of statutorily
privileged records of any third party.

The protocol is grounded in Mass. R. Crim. P. 17 (a) (2), 378
Mass. 885 (1979), which governs pretrial access to "books,
papers, documents, or other objects" (hereafter records) held by
a third party not under the Commonwealth's control,[20] and
*Commonwealth* v. *Lampron,* 441 Mass. 265 (2004) (*Lampron*),
where we set forth mandated procedures and standards for rule
17 (a) (2) motions. The protocol announced today adds new
requirements to our previous cases discussing rule 17 (a) (2),
and shall apply whenever a defendant seeks pretrial records
from a third party that are covered by a statutory privilege. The
new protocol replaces the *Bishop-Fuller* protocols.

In *Lampron,* we considered the final sentence of rule 17 (a) (2),
which states: "The court may direct that books, papers,
documents, or other objects designated in the summons be

[20]The Commonwealth's discovery obligations extend to any document or
information required to be produced that is within its "possession, custody or
control." See Mass. R. Crim. P. 14 (a), as appearing in 442 Mass. 1518
(2004). See *Commonwealth* v. *Beal,* 429 Mass. 530, 531-533 & n.1 (1999),
quoting Mass. R. Crim. P. 14 (a) (1) (C), 378 Mass. 874 (1979).

produced before the court within a reasonable time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents, objects, or portions thereof to be inspected and copied by the parties and their attorneys if authorized by law."[21] We stated that rule 17 (a) (2) "is intended to expedite trial proceedings by avoiding delay caused by the often onerous task of responding to a summons of documents," and emphasized that rule 17 (a) (2) *must* be satisfied before any documents of any kind may be summonsed from any third party prior to trial. *Lampron, supra* at 268-270.[22]

*Lampron* also addressed for the first time the standard that a party must satisfy before a judge orders the issuance of a rule 17 (a) (2) summons before trial. Because our rule is modeled on the analogous Federal rule, Fed. R. Crim. P. 17 (c), we adopted the standard articulated by the United States Supreme Court for issuance of a summons for pretrial production of documentary evidence, *id.* at 270:

> "[T]he party moving to subpoena[23] documents to be produced before trial must establish good cause, satisfied by a showing '(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without

---

[21]Rule 17 (a) (2) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 885 (1979), generally controls when summonses may be issued for attendance of witnesses and may also command that the person to whom the summons is directed produce designated books, papers, documents or other objects. The final sentence in rule 17 (a) (2), providing for pretrial production, is intended to avoid delay to the proceedings that would result if production were not ordered until the commencement of a trial or other judicial proceeding. Reporters' Notes to Mass. R. Crim. P. 17 (a) (2), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1499 (LexisNexis 2005).

[22]To the extent that *Jansen, petitioner*, 444 Mass. 112, 117 n.11 (2005), suggests that for cases commenced after September 7, 2004, Mass. R. Crim. P. 14 (a) (2), as appearing in 442 Mass. 1518 (2004), may be used for "third party discovery," we dismiss any such suggestion. Pretrial access to the records of third parties can be obtained *only* on a judicial order authorizing the issuance of a rule 17 (a) (2) summons.

[23]The term "summons" in the Massachusetts rule is synonymous with "subpoena" as used in Fed. R. Crim. P. 17 (c). *Commonwealth* v. *Lampron*, 441 Mass. 265, 269 n.5 (2004) (*Lampron*).

such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." ' "

*Id.* at 269, quoting *United States* v. *Nixon*, 418 U.S. 683, 669-700 (1974).

Our recent cases have also established that only a judge may issue a rule 17 (a) (2) summons prior to trial, and only on the filing of a motion that satisfies the requirements of Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004), as applied to a rule 17 (a) (2) motion, *Lampron, supra* at 270-271[24]; that the Commonwealth has standing to challenge the issuance of a rule 17 (a) (2) summons, *Commonwealth* v. *Lam*, 444 Mass. 224, 229 (2005); and that a defendant's motion for issuance of a rule 17 (a) (2) summons may proceed ex parte only in clearly defined "exceptional circumstances," *Commonwealth* v. *Mitchell*, 444 Mass. 786, 793 (2005).

In *Lampron*, we commented on the standard that the judge must apply in determining whether the moving party has made a showing sufficient to satisfy the first of the four-requirement

---

[24]Rule 13 (a) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1516 (2004), provides:

"*Grounds and Affidavit.* A pretrial motion shall state the grounds on which it is based and shall include in separately numbered paragraphs all reasons, defenses, or objections then available, which shall be set forth with particularity. If there are multiple charges, a motion filed pursuant to this rule shall specify the particular charge to which it applies. Grounds not stated which reasonably could have been known at the time a motion is filed shall be deemed to have been waived, but a judge for cause shown may grant relief from such waiver. In addition, an affidavit detailing all facts relied upon in support of the motion and signed by a person with personal knowledge of the factual basis of the motion shall be attached."

A rule 17 (a) (2) affidavit may contain hearsay statements so long as the affidavit identifies the source of the hearsay, the hearsay is reliable, and the affidavit "establish[es] with specificity the relevance of the requested documents." *Lampron, supra* at 271. "This relaxation of the personal knowledge requirement of an affidavit in support of a pretrial motion under rule 17 (a) (2) does *not* extend to any other pretrial motion" (emphasis in original). *Id.* Counsel is, of course, "bound by an ethical standard of candor to the court." *Id.*, citing Mass. R. Prof. C. 3.3, 426 Mass. 1383 (1998).

standard. We held that the defendant must "make a factual showing that the documents sought are relevant and have evidentiary value" and that "[p]otential relevance and conclusory statements regarding relevance are insufficient . . . ." *Lampron, supra* at 269.

We have not previously commented on the other three requirements of the *Lampron* standard. The second requirement of rule 17 (a) (2) mandates that the moving party show that the documents sought are "not otherwise procurable reasonably in advance of trial by exercise of due diligence." *Id.*, quoting *United States* v. *Nixon, supra* at 699-700. This imposes on the moving party an affirmative obligation to show that no other source likely exists for the desired records. The third requirement of the rule, "that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial," is designed to limit use of rule 17 (a) (2) to instances where the absence of pretrial production would tend unreasonably to delay the trial. *Lampron, supra.* The final requirement mandates that the moving party establish that the motion is made in good faith and is not intended as a "general 'fishing expedition.' " *Id.* Requirements three and four both serve as a reminder that rule 17 (a) (2) is *not* a discovery tool, *Lampron, supra* at 269, and that the limited purpose of rule 17 (a) (2) is to authorize a court "to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *United States* v. *Nixon, supra* at 698-699, citing *Bowman Dairy Co.* v. *United States*, 341 U.S. 214, 220 (1951).

A statutory privilege may apply to some or all of the records of a third party for which a defendant seeks a summons under rule 17 (a) (2). In *Lampron*, we did not address what, if any, additional requirements a defendant should meet when the records sought are privileged because *Lampron* presumed that the *Bishop-Fuller* protocols would apply once the four *Lampron* requirements were satisfied. *Lampron, supra* at 271-272. Today we replace the *Bishop-Fuller* protocols. To the rule 17 (a) (2) requirements as explicated in *Lampron, supra* at 269-270, we now add further requirements applicable where some or all of

the records sought by the defendant from a third party are presumptively covered by a statutory privilege.[25]

An explanation for the adoption of a new protocol is necessary. In *Bishop, supra* at 175-179, this court explained that allowing a defendant to pierce a statutory privilege may be necessary to effectuate his constitutional right to "put before a jury evidence that might influence the determination of guilt." *Id.* at 176, quoting *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 56 (1987). See *Fuller, supra* at 223, citing *Pennsylvania* v. *Ritchie, supra* at 56-58; *Commonwealth* v. *Stockhammer*, 409 Mass. 867, 883-884 (1991) (*Stockhammer*), and quoting *Commonwealth* v. *Two Juveniles*, 397 Mass. 261, 266 (1986) (defendant's interests at stake in disclosure of statutorily privileged records are "well-established due process rights of an accused, protected by the Constitutions of the United States and of the Commonwealth . . . to gain access to evidence 'shown to be relevant and likely to be significant' or material to his defense, and to use that evidence to confront witnesses and to challenge the validity of the Commonwealth's case"). We need not repeat those discussions here.

In *Bishop*, and again in *Fuller, supra* at 224, this court sought to "strike the proper balance" between a defendant's due process right to such evidence and the protection of a statutory privilege. In *Bishop, supra* at 179-180, this court said that, to pierce a statutory privilege, the defendant must show "at the threshold, that records privileged by statute are likely to contain relevant evidence." Three years later, in *Fuller*, the court held that the "likely to be relevant" standard was "too broad and flexible" when applied to sexual assault counselling records, G. L. c. 233, § 20J, and determined that such records should be produced for in camera inspection only when a defendant "has demonstrated a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant's

[25]Presumptively privileged records are those prepared by a person in circumstances suggesting that the records are likely protected by a statutory privilege, for example a record prepared by one who holds himself or herself out as a psychotherapist, see G. L. c. 233, § 20B; a social worker, see G. L. c. 112, § 135B; a sexual assault counsellor, see G. L. c. 233, § 20J; or a domestic violence victims' counsellor, see G. L. c. 233, § 20K.

guilt," adding that the evidence must tend "to create a reasonable doubt that might not otherwise exist." *Fuller, supra* at 225, 226.[26] The court concluded then, as we do now, that in certain circumstances a defendant must have access to statutorily privileged records "so as not to undermine confidence in the outcome of trial." *Fuller, supra* at 223, quoting *Bishop, supra* at 176. But the "stringent" balance struck in *Fuller, supra* at 227, has given rise to continuing difficulties, many of which have been articulated in the thoughtful briefs we received from amici. See *Commonwealth* v. *Pelosi*, 441 Mass. 257, 258-259 n.1 (2004).

As the claim in the case before us demonstrates, among the most significant difficulties is the inability of defendants to meet the stringent *Fuller* standard, even though statutorily privileged records may contain exculpatory evidence. The *Bishop-Fuller* protocol also embroiled the courts in highly contentious conflicts concerning whether documents were actually privileged. The amended protocol is designed to give the fullest possible effect to legislatively enacted privileges consistent with a defendant's right to a fair trial that is not irreparably prejudiced by a court-imposed requirement all but impossible to satisfy.

Experience has also confirmed that trial judges cannot effectively assume the role of advocate when examining records. Requiring judges to take on the perspective of an advocate is contrary to the judge's proper role as a neutral arbiter. See *Stockhammer, supra* at 882, quoting *Dennis* v. *United States*, 384 U.S. 855, 875 (1966) ("In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate"). Despite their best intentions and dedication, trial judges examining records before a trial lack complete information about the facts of a case or a defense to an indictment, and are all too often unable to recognize the significance, or insignificance, of a particular document to a defense. The absence of an advocate's eye may have resulted in overproduc-

---

[26]In *Commonwealth* v. *Oliveira*, 431 Mass. 609, 616-617 (2000), *S.C.*, 438 Mass. 325 (2002), we made clear that the *Bishop-Fuller* protocol extended to all statutorily privileged records.

tion, as well as underproduction, of privileged records, and has repeatedly contributed to trial delays and appeals, jeopardizing the rights of defendants, complainants, and the public.

Accordingly, the protocol we announce today provides a reasonable opportunity for defense counsel (and *only* defense counsel in the first instance) to inspect pretrial presumptively privileged records produced by a third party, subject to a stringent protective order. We outline here the broad aspects of the protocol and detail the protocol in the attached Appendix.[27] We emphasize that the standard for summonsing third-party records for inspection before trial is intended to guard against intimidation, harassment, and fishing expeditions for possibly relevant information. Rule 17 (a) (2) is not a discovery tool. Before ordering that a summons issue for such records, "[a] judge hearing a rule 17 (a) (2) motion must evaluate whether the *Lampron* requirements of relevance, admissibility, necessity, and specificity have been met . . . ." *Commonwealth* v. *Mitchell*, 444 Mass. 786, 792 (2005).

We now outline the new protocol. First, before a judge determines whether a summons for records may issue to any person or institution, the custodian of the records (record holder) and the third party who is the subject of the records (third-party subject), where applicable, shall be afforded notice and an opportunity to be heard on whether the records sought are relevant or covered by a statutory privilege.[28] The custodian of the records and the third-party subject, where applicable, need not avail themselves of this opportunity, nor shall the third-party subject be required to assert any statutory privilege. Rather, unless and until the privilege holder waives the privilege, all records likely to be covered by a statutory privilege shall remain

[27]Because the protocol will take immediate effect, we today issue an order containing the Appendix, as well as model notices and orders required to implement the protocol. The model notices and orders will be made available initially on the court's Web site and through the office of the Clerk of the Commonwealth of this court. The court will also ask its standing advisory committee on the rules of criminal procedure to review the model notices and orders and suggest revisions as appropriate.

[28]In sexual assault cases, the third-party subject frequently will be the complainant but may be any other witness. Where the third-party subject is a minor or incompetent, the parent or legal guardian shall exercise the interests of the third-party subject, provided the parent or legal guardian is not a party.

and shall be treated as presumptively privileged; there is no requirement at this stage that a judge determine that the summonsed records are in fact privileged.

Second, if a judge orders the issuance of a rule 17 (a) (2) summons, all presumptively privileged records that are summonsed shall be retained in court under seal, and shall be inspected only by counsel of record for the defendant who summonsed the records. Before conducting any such inspection, counsel shall sign, as an officer of the court, and file a protective order containing stringent nondisclosure provisions. Among other things, the protective order shall prohibit counsel from copying any record or disclosing or disseminating the contents of any record to any person, including the defendant. Judges and counsel are required to report any violation of a protective order to the Board of Bar Overseers for disciplinary action. Disclosure of the contents of any record to the defendant or any other person shall be permitted if, and only if, a judge subsequently allows a motion for a specific, need-based written modification of the protective order.[29]

A protocol permitting defense counsel only to inspect presumptively privileged records before trial is not entirely new. See *Stockhammer, supra* at 882-884. We emphasize, however, that there have been significant changes in our jurisprudence since *Stockhammer* was decided. At that time, defense attorneys seeking documents from a third party typically summonsed those records directly to their own offices, without the necessity of obtaining a judicial order. No prior showing of any kind was required, and complainants, witnesses, and record holders were not protected in any respect from intimidation, harassment, or fishing expeditions. In contrast, the requirements we imposed in *Lampron* now permit pretrial production of a third party's records only on a judicial finding that the moving party has satisfied clearly articulated standards designed to guard against such abuses.

---

[29]A judge may review in camera presumptively privileged records as necessary in conjunction with any motion for modification of the protective order.

Following a hearing, a judge may issue a court order permitting defense counsel to disclose some or all of the presumptively privileged records to the defendant or any other person. A violation of such a court order shall be punishable by criminal contempt.

Our decision today is informed by art. 12 of the Declaration of Rights of the Massachusetts Constitution, but is not constitutionally compelled. We therefore apply the new protocol to cases tried after the issuance of the rescript in this opinion. See, e.g., *Commonwealth* v. *King*, 445 Mass. 217, 248 (2005) (applying modification of fresh complaint doctrine prospectively, where modification was exercise of superintendence power and not new constitutional rule); *Commonwealth* v. *Dagley*, 442 Mass. 713, 721 n.10 (2004) ("When announcing a new common-law rule, a new interpretation of a State statute, or a new rule in the exercise of our superintendence power, there is no constitutional requirement that the new rule or new interpretation be applied retroactively, and we are therefore free to determine whether it should be applied only prospectively").

8. *Conclusion.* The judgments are reversed. The verdicts are set aside. The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

1. *Filing and service of a motion pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979).* (a) Whenever in a criminal case a defendant seeks to summons "books, papers, documents, or other objects" (records) from any nonparty individual or entity prior to trial, the defendant shall file a motion pursuant to Mass R. Crim. P. 17 (a) (2), stating the name and address of the custodian of the records (record holder); the name, if any, of the person who is the subject of the records (third-party subject), for example a complainant; and describing, as precisely as possible, the records sought. The motion shall be accompanied by an affidavit as required by Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004), and *Commonwealth* v. *Lampron*, 441 Mass. 265 (2004) (*Lampron*).

(b) The defendant shall serve the motion and affidavit on all parties. Cf. *Commonwealth* v. *Mitchell*, 444 Mass. 786, 800 (2005) (describing "extraordinary circumstances" in which rule 17 [a] [2] process may proceed ex parte).

(c) The Commonwealth shall forward copies of the motion and affidavit to the record holder and (where applicable) to the third-party subject, and notify them of the date and place of the hearing on the motion. See *Lampron, supra* at 270-271. The Commonwealth shall also inform the record holder and third-party subject that (i) the *Lampron* hearing shall proceed even if either is

absent; (ii) the hearing shall be the third-party subject's only opportunity to address the court; (iii) any statutory privilege applicable to the records sought shall remain in effect unless and until the third-party subject affirmatively waives any such privilege, and that failure to attend the hearing shall not constitute a waiver of any such privilege; and (iv) if the third-party subject is the victim in the case, he or she has the opportunity to confer with the prosecutor prior to the hearing. See G. L. c. 258B, § 3 (g).[1]

2. *The* Lampron *hearing and findings.* (a) At the *Lampron* hearing, the judge shall hear from all parties, the record holder, and the third-party subject, if present.[2] The record holder and third-party subject shall be heard on whether the records sought are relevant or statutorily privileged.

(b) Following the *Lampron* hearing, the judge shall make oral or written findings with respect to the records sought from each record holder: (1) that the defendant seeking the records has or has not satisfied the requirements of rule 17 (a) (2), as explicated in *Lampron, supra* at 269, and *Commonwealth* v. *Dwyer, ante* 122, 139-146 (2006); and (2) that the records sought are or are not presumptively privileged. Presumptively privileged records are those prepared in circumstances suggesting that some or all of the records sought are likely protected by a statutory privilege, for example, a record prepared by one who holds himself or herself out as a psychotherapist, see G. L. c. 233, § 20B; a social worker, see G. L. c. 112, § 135B; a sexual assault counsellor, see G. L. c. 233, § 20J; or a domestic violence victims' counsellor, see G. L. c. 233, § 20K.[3] A judge's determination that any records sought are presumptively privileged shall not be appealable as an interlocutory matter, and shall carry no weight in any subsequent challenge that a record is in fact not privileged.

3. *Summons and notice to record holder.* If all rule 17 (a) (2) requirements have been met and there has been no finding that the records sought are presumptively privileged or the third-party subject has waived all applicable statutory privileges, the judge shall order a summons and notice to issue directing the record holder to produce all responsive records to the applicable clerk of the court on the return date stated in the summons.[4] The clerk shall maintain the records in a location separate from the court file, and the records shall be made available for inspection by counsel, as provided in paragraph 4 (a), *infra.* The records shall not be made available for public inspection un-

---

[1]The Supreme Judicial Court today has issued an order containing model notices and orders for use in criminal cases where a defendant seeks pretrial inspection of statutory privileged records of a third party, for example, a model notice for the Commonwealth to use in its communications with the record holder and third-party subject.

[2]The Commonwealth's inability to locate either the record holder or the third-party subject shall not delay the *Lampron* hearing.

[3]Not having reviewed any of the records sought, the judge shall make such determination based on the identity of the record holder or record preparer (if known) and any additional information adduced at the *Lampron* hearing. The defendant shall have the burden of showing that records are not presumptively privileged.

[4]See note 1 of Appendix, *supra,* concerning a model notice to accompany the summons.

less and until any record is filed in connection with a proceeding in the case or introduced in evidence at the trial.[5]

Where a judge has determined that some or all of the requested records are presumptively privileged, the summons and notice shall so inform the record holder, and shall order the record holder to produce such records to the clerk of the court in a sealed envelope or box marked "PRIVILEGED," with the name of the record holder, the case name and docket number, and the return date specified on the summons.[6] The clerk shall maintain the records in a location separate from the court file, clearly designated "presumptively privileged records," and the records shall not be available for inspection except by counsel as provided in paragraph 4 (b), *infra*. The records shall not be made available for public inspection unless and until any record is introduced in evidence at trial.

4. *Inspection of records.* (a) *Nonpresumptively privileged records.* The clerk of court shall permit defense counsel who obtained the summons to inspect and copy all records that are not presumptively privileged. The Commonwealth's ability to inspect or copy the records is within a judge's discretion. Cf. *Commonwealth* v. *Mitchell*, 444 Mass. 786, 800 (2005) (also noting that defendant may have production obligations pursuant to Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 [2004], or other pretrial agreements).[7]

(b) *Presumptively privileged records.* The clerk of court shall permit only defense counsel who obtained the summons to inspect the records, and only on counsel's signing and filing a protective order in a form approved by this court.[8] The protective order shall provide that any violation of its terms and conditions shall be reported to the Board of Bar Overseers by anyone aware of such violation.

5. *Challenge to privilege designation.* If, on inspection of the records, defense counsel believes that any record or portions thereof is in fact not privileged, then in lieu of or in addition to a motion to disclose or introduce at trial, see paragraphs 6 and 7, *infra*, counsel may file a motion to release specified records or portions thereof from the terms of the protective order. Counsel shall provide notice of the motion to all parties. Prior to the hearing, counsel for the Commonwealth shall be permitted to review such records in order to

---

[5]Some records, although not presumptively privileged, may contain information of a personal or confidential nature, such as medical or school records. See, e.g., G. L. c. 71B, § 3 (special education records); G. L. c. 111, §§ 70, 70E (hospital records). The judge may, in his or her discretion, order such records produced subject to an appropriate protective order. See, e.g., paragraph 4 (b), *infra*. See also *Commonwealth* v. *Mitchell*, 444 Mass. 786, 800 (2005) (cautioning that "no inspection of summonsed documents, by either side, shall be allowed until after a full consideration of any privileges, privacy concerns, or other legitimate interests brought to the judge's attention in timely fashion").

[6]See note 1 of Appendix, *supra*, concerning a model notice to accompany the summons.

[7]The Commonwealth may inspect or copy any records if prior consent is given by the record holder and third-party subject (where applicable).

[8]See note 1 of Appendix, *supra*, concerning a model protective order.

respond to the motion, subject to signing and filing a protective order as provided in paragraph 4 (b) of Appendix, *supra.* If a judge determines that any record or portion thereof is not privileged, the records shall be released from the terms of the protective order and may be inspected and copied as provided in paragraph 4 (a) of Appendix, *supra.* See also note 5 of Appendix, *supra.*

6. *Disclosure of presumptively privileged records.* (a) If defense counsel who obtained the summons believes that the copying or disclosure of some or all of any presumptively privileged record to other persons (for example, the defendant, an investigator, an expert) is necessary to prepare the case for trial, counsel shall file a motion to modify the protective order to permit copying or disclosure to specifically named individuals of particular records. The motion shall be accompanied by an affidavit explaining with specificity the reason why copying or disclosure is necessary; the motion and the affidavit shall not disclose the content of any presumptively privileged record. Counsel shall provide notice of the motion to all parties.

(b) Following a hearing, and in camera inspection of the records by the judge where necessary, a judge may allow the motion only on making oral or written findings that the copying or disclosure is necessary for the defendant to prepare adequately for trial. The judge shall consider alternatives to full disclosure, including agreed to stipulations or disclosure of redacted portions of the records. Before disclosure is made to any person specifically authorized by the judge, that person shall sign a copy of the court order authorizing disclosure.[9] This court order shall clearly state that a violation of its terms shall be punishable as criminal contempt.

(c) All copies of any documents covered by a protective order shall be returned to the court on resolution of the case, i.e., on a change of plea or at the conclusion of any direct appeal following a trial or dismissal of the case.

7. *Use of presumptively privileged records at trial.* (a) A defendant seeking to introduce at trial some or all of any presumptively privileged record shall file a motion in limine at or before any final pretrial conference.

(b) Counsel for the Commonwealth shall be permitted to review enough of the presumptively privileged records to be able adequately to respond to the motion in limine, subject to signing and filing a protective order as provided in paragraph 4 (b) of Appendix, *supra.*

(c) The judge may allow the motion only on making oral or written findings that introduction at trial of a presumptively privileged record is necessary for the moving defendant to obtain a fair trial. Before permitting the introduction in evidence of such records, the judge shall consider alternatives to introduction, including an agreed to stipulation or introduction of redacted portions of the records.

8. *Preservation of records for appeal.* Records produced in response to a rule 17 (a) (2) summons shall be retained by the clerk of court until the conclusion of any direct appeal following a trial or dismissal of a case.

---

[9]See note 1 of Appendix, *supra,* for information concerning a model order for use when permitting persons other than defense counsel access to presumptively privileged records.