# IN THE SUPREME COURT OF IOWA

No. 07–2109

Filed July 2, 2010

**STATE OF IOWA,**

    Appellant,

vs.

**ROSS IAN CASHEN,**

    Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Marshall County, William J. Pattinson, Judge.

The State seeks further review of a court of appeals decision allowing a defendant to gain access to a victim's privileged mental health records. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

Thomas J. Miller, Attorney General, Jean C. Pettinger and Mary Tabor (until withdrawal), Assistant Attorneys General, Jennifer A. Miller, County Attorney, and Suzanne M. Lampkin, Assistant County Attorney, for appellant.

Jennifer L. Steffens of Steffens & Grife, P.C., Marshalltown, Kelly T. Bennett, Newton, and Christopher A. Clausen of Boliver, Clausen & Bidwell Law Firm, Marshalltown, for appellee.

**WIGGINS, Justice.**

In this appeal, we review a district court order and court of appeals decision allowing a criminal defendant to gain access to a victim's privileged mental health records. The district court and the court of appeals allowed the defendant access without restriction. We now adopt a protocol that balances a patient's right to privacy in his or her mental health records against a defendant's right to present evidence to a jury that might influence the jury's determination of guilt. Accordingly, we vacate the decision of the court of appeals, affirm in part and reverse in part the judgment of the district court, and remand the case for further proceedings consistent with this opinion.

### I. Background Facts and Proceedings.

This case involves a domestic dispute between Ross Cashen and Jane Doe.[1] As a result of the dispute, on April 18, 2007, the State charged Cashen with the offenses of domestic abuse assault, third offense, and willful injury, class "D" felonies.

On July 3 Cashen filed a notice that he intended to rely on the defense of self-defense. On July 25 Cashen asked the court to enter an order authorizing him to hire an expert to review and aid in the interpretation of Doe's mental health records as well as to present expert testimony to the jury regarding Doe's credibility and propensity for violence. The district court denied the motion, finding it was premature because the court had not made a determination as to whether the records would be admissible at trial.

Cashen then proceeded to depose Doe. In her deposition, Doe acknowledged she had been involved in past abusive relationships with other men. She also testified she had been diagnosed with posttraumatic

---

[1]We have changed the name of the victim to protect her privacy.

stress disorder, anxiety, depression, and had been in counseling and therapy since she was fifteen years old. She indicated she had displayed impulsive and reactive behavior in the past and became easily frustrated when she was in her relationship with Cashen. Doe also said she was taking a prescription antidepressant. She said she was taking the medication because she was nervous about the safety and welfare of her boyfriend, who was serving in the armed services. She also believed Cashen was a very violent man, and she worried about retribution from him.

Cashen also employed a private investigator who acquired some of Doe's mental health records from a medical office and a hospital. After the State learned Cashen had acquired these records, it filed a motion in limine to exclude the records, as well as other matters, from trial. The State also sought to preclude admission of Doe's prior mental health history revealed in her deposition.

The district court denied the motion in limine. It found the mental health history of Doe, specifically her propensities for violence and explosive behavior, was relevant to Cashen's defense of self-defense. It also determined the records could be relevant to Doe's credibility as a witness to accurately observe and recall the events leading to the charges and may be helpful to impeach her at trial. The court continued the trial to allow Cashen the opportunity to secure an expert to review the records and testify, if necessary, on the issues of Doe's propensity for violence and her credibility.

On November 29 Cashen filed two separate motions, the first to reconvene Doe's deposition and the second to obtain Doe's mental health records. On December 11 the court ordered Doe to execute a patient waiver form in favor of Cashen's counsel and, upon receipt of the

records, permit Cashen's counsel to reconvene the deposition of Doe to explore those areas connected to the records.

The State responded by filing an application for discretionary review. We granted the application and transferred the case to the court of appeals. The only issue argued on appeal was whether the district court erred in allowing the disclosure of Doe's mental health records.

The court of appeals affirmed the district court's order in part and reversed in part. It found Cashen had demonstrated a compelling need for the mental health records and affirmed the decision of the district court ordering disclosure of the records and admission of expert testimony on the issues of Doe's propensity for violence and her credibility. It additionally found the district court had no authority to order the State to secure and produce the patient waiver of a witness, but failed to further address the procedure for the production of the records. We granted further review.

## II. Standard of Review.

Ordinarily, we review discovery orders for an abuse of discretion. *State v. Schuler*, 774 N.W.2d 294, 297 (Iowa 2009). However, to the extent the issues in this case involve constitutional claims, our review is de novo. *State v. Reyes*, 744 N.W.2d 95, 99 (Iowa 2008). Because the issues in this case rest on constitutional claims involving Cashen's due process right to present a defense, our review is de novo. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S. Ct. 989, 1001, 94 L. Ed. 2d 40, 57 (1987) (holding a due process analysis applies in determining whether to disclose a child protective service agency's privileged records for purposes of a defendant presenting a defense).

### III. Analysis.

**A. The State's Claims.** In *State v. Heemstra*, 721 N.W.2d 549, 563 (Iowa 2006), we allowed a defendant to obtain the medical records of a homicide victim to assist the defendant in presenting his defense. There, the defendant was facing a first-degree murder charge that carried a sentence of life in prison without the possibility of parole. *Heemstra*, 721 N.W.2d at 551, 563. In this appeal, the State argues this case is distinguishable from our decision in *Heemstra* because it "does not present any 'unique facts' warranting abrogation of the psychotherapist privilege and intrusion into the victim's mental health records." The only real difference between this case and *Heemstra* is the severity of the penalty. If convicted, Cashen can be deprived of his liberty and potentially sentenced to ten years in prison. *See* Iowa Code § 902.9(5) (2005) (stating a defendant's conviction for a class "D" felony subjects the defendant to possible confinement for no more than five years). Regardless of the charge or the penalty, all defendants have a right to a fair trial. *See generally Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075, 111 S. Ct. 2720, 2745, 115 L. Ed. 2d 888, 923 (1991) (Rehnquist, C.J., dissenting in part) ("Few, if any, interests under the Constitution are more fundamental than the right to a fair trial."). Thus, there is no reason to apply the law regarding the disclosure of privileged records differently based on the severity of a defendant's sentence.

The State's fallback position is that if the records are made available to the defendant's attorney, the records should only be disclosed on a limited basis. We agree that if privileged records are to be made available in a criminal proceeding, a certain protocol must be followed to balance the patient's right to privacy with the defendant's right to present evidence to a jury that might influence the jury's

determination of guilt. Today, we set forth the proper protocol to be used by a court to determine when and how a defendant's attorney can gain access to a victim's privileged mental health records.

**B. Prior Case Law.** We have previously applied a balancing test to determine if a party to a proceeding is entitled to review the confidential medical records of a nonparty. *Chidester v. Needles*, 353 N.W.2d 849, 853 (Iowa 1984). The first decision to adopt and apply this test was *Chidester*. *Id.* In *Chidester*, the county attorney sought thirteen patients' medical records in connection with his investigation into Medicaid fraud. *Id.* at 851. The first issue we considered was the nature of the patients' right in keeping the records private. *Id.* at 851–53. We rejected the patients' claim that Iowa Code section 622.10, the statutory physician-patient privilege, protected the records from the county attorney's subpoena because section 622.10 only protects the giving of testimony. *Id.* at 852–53. Instead, we determined the patients' constitutional right to privacy protected the patients' interests in avoiding disclosure of personal matters and maintaining independence when making certain kinds of important decisions. *Id.* at 853.

Although we recognized the patients had a constitutional right to privacy in their medical records, we acknowledged this privilege was not absolute, but qualified. *Id.* Thus, we adopted a balancing test and stated, "The privacy interest must always be weighed against such public interests as the societal need for information, and a compelling need for information may override the privacy interest." *Id.* In weighing the interests, we said, "[S]ociety has a strong interest in allowing official investigators of criminal activity broad authority to conduct thorough investigations." *Id.* We also declared, "[T]he privacy interest must be balanced against society's interest in securing information vital to *the fair*

*and effective administration of criminal justice.*"  *Id.* (emphasis added). We then concluded the patients' privacy interest in their records yielded to "the State's interest in well-founded criminal charges and the fair administration of criminal justice" and allowed the county attorney to subpoena the records.  *Id.* at 854.

The next case to discuss the balancing test was *McMaster v. Iowa Board of Psychology Examiners*, 509 N.W.2d 754, 759 (Iowa 1993). There, the board of psychology examiners subpoenaed a patient's records from a psychologist who was not under investigation.  *McMaster*, 509 N.W.2d at 755.  The patient filed a petition to quash the subpoena.  *Id.* at 756.  In concluding the patient's constitutional privacy interest in her records is not absolute, we applied the balancing test.  *Id.* at 759.

In applying the balancing test, we found the board's public interest was its statutory duty to police mental health professionals.  *Id.*  After recognizing this public interest, we adopted a protocol for determining whether a patient's privacy interest in his or her mental health records must yield to a competing interest of the State.  *Id.* at 759–60.  The protocol first required the party seeking access to the records must "make a minimal showing that the complaint reasonably justifies the issuance of a subpoena in furtherance of the investigation."  *Id.* at 759. Second, the party seeking access to the records must show the records are necessary as evidence in the disciplinary proceedings.  *Id.*  This requirement can be satisfied by an *in camera* review of the records by the district court.  *Id.*  Third, the party seeking access to the records must notify the patient and request a waiver from the patient prior to issuing the subpoena.  *Id.* at 760.  Fourth, the party seeking access to the records should establish the existence of adequate safeguards to avoid unauthorized disclosure.  *Id.*  Last, the patient's privacy interest in the

records will yield to a competing interest of the State only if there is an articulated public policy, recognized public interest, or an express statutory mandate " 'militating toward access.' " *Id.* (quoting *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980)).

Our most recent case to apply the balancing test was *Heemstra*. In *Heemstra*, we allowed "limited disclosure" of the victim's medical records based on the unique facts presented in the case. *Heemstra*, 721 N.W.2d at 563. We held "the records [should] be made available to defense and prosecution counsel . . . under a protective order prohibiting any further dissemination without court order." *Id.*

**C. Third Party's Right to Privacy in her Mental Health Records.** We recognize a patient's right to privacy in his or her mental health records because

> "[p]sychotherapy probes the core of the patient's personality. The patient's most intimate thoughts and emotions are exposed during the course of the treatment. The psychiatric patient confides [in his therapist] more utterly than anyone else in the world. . . . [H]e lays bare his entire self, his dreams, his fantasies, his sin, and his shame. The patient's innermost thoughts may be so frightening, embarrassing, shameful or morbid that the patient in therapy will struggle to remain sick, rather than to reveal those thoughts even to himself. The possibility that the psychotherapist could be compelled to reveal those communications to anyone . . . can deter persons from seeking needed treatment and destroy treatment in progress."

*McMaster*, 509 N.W.2d at 758 (quoting *Haw. Psychiatric Soc'y v. Ariyoshi*, 481 F. Supp. 1028, 1038 (D. Haw. 1979) (citations omitted)). Accordingly, these reasons are important in our application of the balancing test.

**D. Public Interest in Allowing the Defendant to Obtain the Records.** Excluding evidence from a criminal trial for some purpose other than enhancing the truth-seeking process of the proceeding

increases the danger of convicting an innocent person. Under the United States Constitution, a criminal defendant has a due process right to present evidence to a jury that might influence the jury's determination of guilt. *Ritchie*, 480 U.S. at 56, 107 S. Ct. at 1000–01, 94 L. Ed. 2d at 56–57. The Supreme Court has also said that "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, 384 U.S. 855, 870, 86 S. Ct. 1840, 1849, 16 L. Ed. 2d 973, 984 (1966). Thus, a defendant's right to produce evidence that is relevant to his or her innocence is an important public interest that we must consider in applying the balancing test.

**E. The Proper Protocol for Requesting the Privileged Mental Health Records of a Victim.** The purpose of providing a defendant with the privileged records of a victim is to lessen the chance of wrongfully convicting an innocent person. Society shares this interest. In fact, the Federal and Iowa Constitutions include numerous safeguards to prevent the wrongful conviction of the innocent. *See, e.g.*, U.S. Const. amend. VI (guaranteeing an accused the right to a speedy and public trial by an impartial jury, to be informed of the accusations against him or her, to confront witnesses, to have compulsory process, and to have the assistance of counsel in a criminal prosecution); Iowa Const. art. I, § 10 (same). On the other hand, the interest in preventing wrongful convictions does not justify giving defendants access to all of a victim's privileged records from the time of birth.

We continue to adhere to a balancing test, and now take the opportunity to articulate a standard that judges can consistently apply to identify those circumstances when the defendant's right to a fair trial outweighs the victim's right to privacy. This standard allows a defendant

to obtain the records necessary to put forth evidence tending to show the defendant's innocence, but does not permit the defendant to go on a fishing expedition into a victim's privileged records. Because of the importance of the public interest in not convicting an innocent person of a crime, any standard should resolve doubts in favor of disclosure.

In *McMaster*, we developed a protocol that balanced the interest of the State against the privacy interest of the patient when an agency sought to obtain the patient's privileged mental health records. *McMaster*, 509 N.W.2d at 759–60. Today, we formulate a similar protocol when a criminal defendant, who is represented by counsel, requests the privileged mental health records of a victim.[2] The protocol we adopt today strikes the proper balance between a victim's right to privacy in his or her mental health records and a defendant's right to produce evidence that is relevant to his or her innocence.

First, we want to emphasize that a defendant is not entitled to engage in a fishing expedition when seeking a victim's mental health records. Before a subpoena may issue for a victim's privileged records, the defendant must make a showing to the court that the defendant has a reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt. *Ritchie*, 480 U.S. at 58 n.15, 107 S. Ct. at 1002 n.15, 94 L. Ed. 2d at 58 n.15. In doing so, the defendant need not show the records actually contain information for establishing the unreliability of a charge or witness. *Commonwealth v. Bishop*, 617 N.E.2d 990, 996–97 (Mass. 1993), *abrogated by Commonwealth v. Dwyer*, 859 N.E.2d 400, 414, 417–19 (Mass. 2006). A defendant need only advance some good faith factual

---

[2]We express no opinion as to the applicability of this protocol when the defendant is self-represented.

basis indicating how the records are relevant to the defendant's innocence. *Id.* Thus, to begin this process, a defendant's counsel must file a motion with the court demonstrating a good faith factual basis that the records sought contain evidence relevant to the defendant's innocence. The motion shall be marked confidential, filed under seal, and set forth specific facts establishing a reasonable probability the records sought contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt. The motion shall also request the court issue a subpoena requiring the custodian of the records to produce the records sought by the defendant. Defendants or their attorneys shall not subpoena a victim's privileged records without a court order.

Second, the county attorney shall notify the victim that the defendant has made a request for the victim's privileged records. After conferring with the victim, the county attorney shall provide the court with an affidavit signed by the victim stating the victim either consents to or opposes the disclosure of the records. If the victim consents to the disclosure, the court shall issue a subpoena for the records to be produced under seal to the court. If the victim opposes the disclosure, the court shall hold a hearing to determine if a reasonable probability exists that the records contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt. If the court determines a reasonable probability exists that the records contain such evidence, the court shall issue a subpoena for the records to be produced under seal to the court.

Before issuing the subpoena, the court shall enter a protective order containing stringent nondisclosure provisions. The protective order shall prohibit any attorney, county attorney, or third party who is

allowed to inspect or review the records under this protocol from copying, disclosing, or disseminating the information contained in the records to any person, including the defendant, unless otherwise authorized by this protocol or the court. In addition, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) requires the Secretary of the Department of Health and Human Services to issue regulations to insure the privacy of health care records. 42 U.S.C. § 1320d-2(d)(2) (2003). To comply with the privacy and security rules enacted by the Secretary, the protective order shall also contain provisions: (1) prohibiting the parties from using or disclosing the records or the information contained in the records for any purpose other than the criminal proceeding for which the records were sought, and (2) requiring an attorney, county attorney, or third party who is allowed to inspect or review the records under this protocol to destroy the records (including all copies made) at the end of the proceeding. 45 C.F.R. § 164.512(e)(1)(ii)(B), .512(e)(1)(v) (2010). The subpoena shall contain language stating that prior to the court issuing the subpoena, the court has entered a protective order complying with the requirements of HIPAA's privacy and security rules. A copy of the protective order shall be served with the subpoena. *Id.* § 164.512(e)(1)(ii)(B), .512(e)(1)(iv).

Third, if the records are produced, the attorney for the defendant who obtained the subpoena shall have the right to inspect the records at the courthouse. An *in camera* review of the records by the court is insufficient. Only the attorneys representing the parties know what they are looking for in the records. The court cannot foresee what may or may not be important to the defendant. *Heemstra*, 721 N.W.2d at 563; *see also Dwyer*, 859 N.E.2d at 418 ("Despite their best intentions and dedication, trial judges examining records before a trial lack complete

information about the facts of a case or a defense . . . and are all too often unable to recognize the significance, or insignificance, of a particular document to a defense.").

Fourth, after the attorney for the defendant has identified the records he or she believes contain exculpatory evidence, the attorney shall notify the county attorney and the court of the specific records the defendant desires and ask that the matter be set for hearing. Prior to the hearing, the county attorney may review the designated records at the courthouse. If the county attorney reviews the records, he or she is subject to the protective order entered by the court.

Fifth, the court shall hold a hearing to determine if the designated records contain exculpatory evidence. The court shall close the hearing to the public to protect the victim's privacy. The court shall give notice of the hearing to the defendant's attorney and the county attorney. If the court determines the designated records contain such evidence, the court shall provide a copy of any such records to the defendant's attorney and the county attorney. Before providing these records to counsel, the court shall order that all non-exculpatory matters in the records provided be redacted prior to the records being removed from the courthouse. In order to protect the privacy rights of the victim, these records will continue to be subject to the protective order entered by the court. Before either attorney can disclose the records to a third party, including potential expert witnesses, the attorney must obtain an order from the court allowing such disclosure and requiring the person to whom the records are disclosed to be bound to the same nondisclosure provisions imposed on the attorneys. A copy of the protective order shall be given to the third party when the party receives copies of the records.

The protocol we have outlined for discovery purposes does not necessarily mean the victim's mental health records are admissible at trial. Whether the records meet the requirements for admission under our rules of evidence is a separate determination that the court will make at trial or in ruling on a motion in limine. If the court ultimately decides the records are admissible, the court shall consider alternatives to the introduction of the records as proffered. These alternatives may include stipulations by the parties or the introduction of redacted portions of the records.

All records produced under seal to the court pursuant to a subpoena shall be preserved for appeal purposes. After completion of the appeal, all persons who have copies of the records shall destroy their copies and certify to the court that the records in their possession have been destroyed.

In formulating this protocol, we have considered whether a defendant should be required to make a showing that the information sought in the records could not be obtained from another source, such as the victim's testimony, before the defendant is allowed to seek production of the victim's mental health records. We reject such a requirement because we do not believe a patient's rendition of his or her medical condition and treatment is necessarily reliable. For example, without examining Doe's records, Cashen cannot be sure the information provided in Doe's deposition testimony accurately reflects her true mental health condition. Sometimes individuals are less than candid concerning their condition when talking to others. In other instances, individuals may not fully understand their condition, notwithstanding their health care providers' efforts to explain it to them. Finally, such records often contain information not given to a patient or information

forgotten by a patient. The only way to assure that Cashen has adequate and accurate information to defend properly against the criminal charges is to give him access to those portions of Doe's records that are relevant to Cashen's innocence. By using the protocol outlined above, the invasion of Doe's right to privacy in her mental health records is minimized.

**F. Application of the Protocol.** In her deposition, Doe admitted punching the defendant. On two prior instances, she has been charged with domestic abuse against her ex-husband. She admits to having posttraumatic stress disorder for which she has sought counseling. She also admitted to being frustrated easily and having difficulty controlling impulsive behavior. Based on this testimony, the district court found the mental health history of Doe, relating to her propensities for violence and explosive behavior, was relevant to Cashen's defense of self-defense and to Doe's credibility as a witness. This evidence is exculpatory because it tends to create a reasonable doubt as to Cashen's guilt.

We agree with the district court that Doe's deposition testimony satisfies Cashen's requirement to establish a reasonable probability exists that the records contain exculpatory evidence. On remand, the court shall issue a subpoena for the records to be produced under seal to the court. Thereafter, the court and the parties shall comply with the remaining requirements of the protocol.

**IV. Disposition.**

We affirm the district court decision to the extent it allowed Cashen's attorney to inspect the mental health records of Doe. We reverse that part of the decision requiring Doe to execute a patient's waiver in favor of Cashen's attorney. Therefore, we vacate the decision of the court of appeals and remand the case to the district court to follow

the protocol contained in this opinion pertaining to the disclosure of a victim's privileged records.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Cady, J., who dissents.

**CADY, Justice (dissenting).**

I respectfully dissent. The majority announces and professes to apply a balancing test to reach its conclusion that Doe must turn over her confidential counseling records for examination by Cashen and his attorney (and others) under a protocol directed by the trial court. In truth, the majority has abandoned the balancing test without acknowledgement. In its place, the majority has substituted a policy judgment that all defendants in a criminal case are entitled to view confidential medical and counseling records of a victim to an alleged crime when the defendant asserts a legal claim or issue that makes the contents of the confidential records relevant to the claim or issue in the case. The balancing test is unceremoniously abandoned because confidential records must now be disclosed once relevance is shown regardless of any particular surrounding circumstances of the case that may reveal a diminished need for the particular records by the defendant and regardless of a heightened need to protect the confidentiality of the records. The majority adopts one of the weakest tests known to the law in an area of the law that deals with the clash of two of the most compelling and venerable interests known to the law. This is a step backwards. It gives the defendant more power than necessary to protect the right to a fair trial, while presenting a serious risk of a different form of abuse for victims of domestic violence. This new test may also ultimately cause victims to decline to report domestic abuse in order to protect themselves from being required to disclose very personal and private information to the alleged abusers and other parties to the prosecution.

One fundamental interest at stake in this case involves a belief of most Iowans that information communicated by a patient to a doctor or counselor will be confidential. For over 150 years, Iowa has recognized that confidential communications between a physician and a patient constitute privileged information. *See* Iowa Code § 622.10 (2007) (establishing current privilege of confidentiality between physician and patient); 7 Laurie Kratky Dorè, *Iowa Practice Series: Evidence* § 5.504:2, at 365 & n.2 (2009) (tracing the root of the physician-patient privilege statute to the 1851 Iowa Code) [hereinafter Dorè]. Although this privilege did not exist at common law, it has been a cornerstone of the professional ethics of physicians for over a century.[3] *See* 1 Kenneth S. Broun et al.*, McCormick on Evidence* § 98, at 446–47 (6th ed. 2006) [hereinafter *McCormick*]. The privilege surfaced in Iowa as an enactment by our legislature in 1851, shortly after we became a state. Iowa Code § 2393 (1851). Today, the venerable statutory privilege not only precludes physicians from disclosing through testimony any confidential communication by a patient, but also prohibits the disclosure of medical records containing confidential communications. *State v. Heemstra*, 721 N.W.2d 549, 560 (Iowa 2006). The rationale for a law protecting

---

[3]The American Medical Association (AMA) was the first national professional medical organization in the world. American Medical Association, History of AMA Ethics, http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/history-ama-ethics.shtml (last visited June 22, 2010). The AMA promulgated the first code of ethics for physicians in 1847. *Id.* The current version of the ethical code still remains the authority governing physicians' conduct. *Id.* In its first version of the code, the AMA declared that the "obligation of secrecy" should be observed by all physicians. *See* American Medical Association, *Code of Medical Ethics of the American Medical Association* ch. 1, art. I § 2, at 93 (1847), *available at* http://www.ama-assn.org/ama/upload/mm/369/1847code.pdf. The AMA also pointed out in this early ethics code, "[t]he force and necessity of this obligation [of confidentiality to patients] are indeed so great, that professional men have, under certain circumstances, been protected in their observance of secrecy, by courts of justice." *Id.* Over 160 years later, this ethical rule of confidentiality still governs practicing physicians.

information acquired by a physician from disclosure is to promote complete and open communication by a patient to enable the physician to make a proper diagnosis and render appropriate treatment. *State v. Deases*, 518 N.W.2d 784, 787 (Iowa 1994). If patients know or fear the information they tell their doctor may be disclosed in the future, they may be reluctant to disclose information embarrassing to them but needed by the doctor to render proper care.

While our rules and cases applying Iowa Code section 622.10 generally reflect "great solicitude for the physician-patient privilege," the privilege is deemed to be even more important in the treatment of mental health. *Heemstra*, 721 N.W.2d at 560–61. The greater protections in the area of mental health treatment are justified primarily because of the enhanced need for a strong relationship of trust and confidence between the patient and provider and the extremely personal and sensitive information frequently disclosed in the course of mental health counseling. *See id.* at 561. Any threat of disclosure of such information would obstruct, if not bar, successful treatment. *See McCormick* § 98, at 447. Moreover, unwanted disclosure of highly personal information separately implicates one of the most fundamental tenets of all law—the right to privacy. *Heemstra*, 721 N.W.2d at 561. Thus, we are not just dealing with a strong belief recognized by statute, but a right with roots found in our constitution. The privilege necessarily recognizes a right to protect the privacy interests of the individual to keep private information from public disclosure, independent from the need for optimum medical treatment recognized by statute. *See McMaster v. Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 758–59 (Iowa 1993) (recognizing a constitutional right of privacy in mental health records). Nevertheless, all fifty states and the District of Columbia have statutes that protect the

communication between patients and their therapists. *Jaffee v. Redmond,* 518 U.S. 1, 12, 116 S. Ct. 1923, 1929, 135 L. Ed. 2d 337, 346 (1996). Our legislature has separately considered the special interest involved in mental health and psychological information and has provided comprehensive rules prohibiting disclosure except under very limited circumstances.[4] *See generally* Iowa Code ch. 228 (providing rules of limited disclosure for a patient's mental health records). These rules, however, do not specifically address the disclosure of mental health information in a criminal proceeding, but the right to privacy derived from our constitution remains a forceful protection against disclosure.

I recognize the privilege expressed in section 622.10 does not expressly apply to discovery disputes. Yet, the purpose and rationale of the statute unmistakably applies to pretrial discovery in a criminal case with the same vigor and importance as to the testimonial stage of trial. *See Newman v. Blom,* 249 Iowa 836, 844, 89 N.W.2d 349, 354–55 (1958) (recognizing medical records contain the same protected confidential information as a physician's direct testimony about the communications). Discovery of witness records is a predicate step to trial testimony and is guarded by the same basic underlying considerations. Moreover, it is important to discuss the privilege in the context of the statute because the statute has been the forum largely responsible for the development of the law, even though the privilege also has its roots in the broad constitutional right to privacy. *See McMaster,* 509 N.W.2d at 758 (recognizing the roots of the right to privacy in mental

---

[4]For example, Cashen's access to the records obtained in this case would presumably violate Iowa Code section 228.2, as the disclosure of the records to Cashen's private detective does not appear to qualify under any of the five listed exceptions stated in section 228.2(1). Furthermore, under this record, there is no evidence that the custodians of Doe's medical records complied with the mandatory procedures associated with disclosure. *See* Iowa Code § 228.2(2).

health records). Nevertheless, our legislature has left discovery disputes over confidential records for the courts to resolve, and it is incumbent on courts to develop a workable standard and resolve each dispute. The statutory privilege is not a legal defense to a discovery dispute, but the rationale of the privilege provides an important perspective in gaining a full understanding of the privacy interest at stake.

The competing fundamental interest at stake in this case is derived from constitutional protections provided to an accused to confront witnesses in a criminal trial and to be given a fair trial. A defendant in a criminal case not only has a right to confront witnesses with effective cross-examination, but due process and the right to a fair trial also demand an accused be given a full and fair opportunity to present a claim of self-defense. *See Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347, 353 (1974) (recognizing defendant's right to confront witnesses with adequate cross-examination); *see also Chambers v. Mississippi*, 410 U.S. 284, 297–98, 93 S. Ct. 1038, 1047, 35 L. Ed. 2d 297, 310 (1973) (recognizing defendant's right to due process includes the right to present a defense by cross-examining witnesses). Although a defendant's constitutional right of confrontation is not limitless, a decision denying a defendant access to " 'a certain class of evidence, even for the purpose of preventing a witness from suffering embarrassment on the stand, should not limit the Sixth Amendment right of a defendant to confront the witness against him.' " *State v. Howard*, 426 A.2d 457, 460 (N.H. 1981) (quoting State of New Hampshire's appellate brief); *see also Chambers*, 410 U.S. at 295, 93 S. Ct. at 1046, 35 L. Ed. 2d at 309 ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.").

Moreover, despite the power vested in state legislatures to protect the privacy rights of victims, "[c]riminal defendants have been guaranteed numerous rights by the fourth, fifth, and sixth amendments, and states may not infringe upon them regardless of general legislative power." J. Alexander Tanford & Anthony J. Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U. Pa. L. Rev. 544, 554–55 (1980).

The clash between the two fundamental constitutional interests occurs in this case largely due to the presence of the self-defense claim. Normally, mental health information of a victim is not admissible as character evidence in a criminal proceeding. *See generally State v. Jacoby*, 260 N.W.2d 828, 837 (Iowa 1977) (noting the general inadmissibility of evidence relating to homicide victim's character). When the defense of self-defense is raised, however, evidence of a victim's quarrelsome or violent disposition may become relevant to help establish the victim as the initial aggressor or the state of mind of the defendant. Dorè § 5.404:3, at 206–08. Such evidence of the victim's character may be introduced through testimony concerning the victim's reputation or by opinion testimony of a witness familiar with the victim. Iowa R. Evid. 5.405(*a*). It may also be shown by specific conduct. Iowa R. Evid. 5.405(*b*). In this case, Cashen asserts the mental health records of Doe are relevant to help formulate his self-defense claim through an expert witness and to impeach Doe on cross-examination in the event she is inconsistent or untruthful in her testimony on direct examination. There is also a suggestion that the records may help determine if Doe's ability to accurately recall the incident is impaired. Cashen asserts his right to a fair trial demands discovery of the records.

In *Heemstra*, we developed a compelling-need test to resolve the clash between the competing interests of confidentiality and a fair trial in

the context of a criminal prosecution.[5]  721 N.W.2d at 563.  The test is based on the premise that a point exists when even the strong interest of confidentiality of mental health information must give way to a defendant's right to confront witnesses and the right to present a defense in a criminal case.  *Id.* at 562–63.  In other words, this case involves a clash of two constitutional rights, and each case must be carefully examined to determine the point where one right must give way to the other.  *See Chidester v. Needles*, 353 N.W.2d 849, 853 (Iowa 1984).

We relied on four factors in *Heemstra* in balancing the interests at stake to conclude limited disclosure of confidential mental health records was required in that case.  First, disclosure was not only sought in the course of a criminal case, but the defendant faced the most severe penalty possible under the law.  *Heemstra*, 721 N.W.2d at 563.  This factor indicated the weight of the consequential harm of nondisclosure to the accused.  Second, the person who was the subject of the medical records was deceased.  *Id.*  Although the physician-patient privilege continues after death, this factor tended to diminish the importance of protecting the records from disclosure because the fear of disclosure for a patient after death is not as compelling for the patient as the fear of

---

[5]The seeds of this test were planted in *Chidester v. Needles*, 353 N.W.2d 849 (Iowa 1984), a contempt proceeding involving the issuance of a county attorney subpoena seeking medical records in the course of an investigation into suspected criminal activity.  We recognized the issue involved a clash between the privacy interests of patients and the public interests in the fair administration of justice, and indicated the issue was resolved by balancing the two competing interests.  *Chidester*, 353 N.W.2d at 853.  We subsequently amplified this test in *McMaster*, where we imposed the burden on the entity seeking the confidential records to show the interests in disclosure were greater than the interests of confidentiality.  509 N.W.2d at 759.  We also developed a five-factor test for an administrative agency to follow in attempting to satisfy the burden to obtain confidential records to investigate a complaint made to the agency.  *Id.* at 759–60.  Thus, the balancing test took root in the context of investigative proceedings and was adopted in *Heemstra* as the test in the context of criminal proceedings.

disclosure before death. *See McCormick* § 102, at 462 (recognizing privilege continues after the patient's death); *see also United States v. Hansen*, 955 F. Supp. 1225, 1226 (D. Mont. 1997) ("The holder of the privilege has little private interest in preventing disclosure, because he is dead."). Third, some of the information subject to disclosure in the case had been voluntarily placed in the public domain during the pendency of the case by virtue of a civil lawsuit filed by the executor of the victim's estate. *Heemstra*, 721 N.W.2d at 563. This factor tended to diminish the need to protect the confidential interests of the particular patient. Finally, the nature of the confidential information was such that it could reasonably be viewed as an aid to the defendant in his self-defense claim. *Id.* This factor was considered to be the most important criteria in the case because it not only placed the constitutional right to a fair trial into play, but it identified the specific need for the information and the particular prejudice that would be suffered by the accused without the information. *See United States v. Alperin*, 128 F. Supp. 2d 1251, 1255 (N.D. Cal. 2001) (recognizing records material to self-defense claim outweigh victim's interest in confidentiality).

The factors we identified in *Heemstra* were not exhaustive, but instructive of the general approach courts should take in applying a balancing test in criminal cases. This test focuses on all the facts and circumstances of each case to fully assess a compelling need for the information. The burden to establish a need for the victim's records is on the defendant. *See McMaster*, 509 N.W.2d at 759 (imposing burden on entity seeking the records). The relevant factors essentially allow the strength of the competing interests to be compared within the context of each individual case. This is the best method to achieve a just result.

The problem with the decision of the majority is the important case-specific balancing of the competing interests is discarded. As a clash between constitutional rights, this approach seems inconceivable. The majority claims to adhere to the balancing process through the use of protocol, but the protocol requires the disclosure of the confidential records based merely on a showing of relevancy. This new test does not consider any particular need for the victim to maintain privacy, nor does the test allow any particular circumstances of the defendant to be identified that may militate against full disclosure. More importantly, it fails to balance the competing interests by flushing out a compelling need for the confidential records. Instead, the new test presumes mere relevancy satisfies the compelling need and uses the protocol to realign the interests of the victim from preventing disclosure to minimizing disclosure. The right of the victim to keep records private from the court, defendant, attorneys, and various court and attorney employees is completely ignored.

In this case, the majority orders Doe to turn over all her medical and counseling records from the time she was a young teenager because Cashen has asserted a claim of self-defense and Doe has admitted she has a history of counseling that includes impulsive behavior and that she becomes frustrated easily due to posttraumatic stress disorder. Absent from the analysis is any consideration that could diminish Cashen's need for the confidential reports.

First, Doe is available to testify at trial, and she has already provided Cashen with an abundance of testimony under oath relevant to the claim of self-defense. Second, Cashen was married to Doe and likely possesses personal knowledge of the propensity and character of Doe to assist him in his claim of self-defense, including any propensity for

aggression or violence, based on his past relationship with her. Third, there was no proof by Cashen that relevant evidence of Doe's character could not be obtained from other witnesses familiar with her background, disposition, and general reputation. Finally, although Cashen may utilize an expert witness to assist him to present his claim of self-defense, there was no proof that such assistance would not be available without additional medical records. Cashen has not argued, let alone established, his expert could not effectively present the desired opinion testimony about Doe's character and propensities derived from her various medical diagnoses without first reviewing the medical records he seeks. Importantly, Cashen has failed to articulate specific grounds to explain how the records would aid in his self-defense claim in light of the evidence he possesses and the evidence available to him without the records.

Conversely, the public policy embedded in the battle against domestic abuse should heighten the need to protect the confidentiality of medical and counseling records of victims in domestic-abuse cases. While domestic abuse was rarely prosecuted as a crime in the not-too-distant past, it is now a common subject of civil and criminal enforcement in this state and nationwide.[6] Moreover, it is not uncommon for victims of domestic abuse to suffer from anxiety, depression, and posttraumatic stress disorder. Evan Stark, *Re-*

---

[6]Domestic violence is recognized almost universally as "an ever-widening epidemic" for which the legal system has continued to work towards a cure. *See* Betsy Tsai, Note, *The Trend Towards Specialized Domestic Violence Courts: Improvements on an Effective Innovation*, 68 Fordham L. Rev. 1285, 1287 (2000). While domestic abuse was generally socially and legally acceptable for centuries, the trend to end such violence has progressed substantially. In Iowa, statistics show that from 1990 to 1993, domestic abuse civil filings rose from 188 to 2677. Supreme Court Task Force on Courts' and Communities' Response to Domestic Abuse, *Final Report* 6 (1994), *available at* http://www.iowacourts.gov/wfdata/frame9830-1152/File9.pdf.

*Presenting Woman Battering: From Battered Women Syndrome to Coercive Control*, 58 Albany L. Rev. 973, 997 (1995). Consequently, as the number of domestic-abuse prosecutions increases, so does the threat of disclosure of confidential records of prosecuting witnesses. Likewise, as the threat of disclosure of confidential records of victims increases, the public policy responsible for the greater reporting and prosecution of domestic abuse that is part of the overall effort to address domestic violence is likely to suffer. If victims of domestic violence must suffer the embarrassing and debilitating loss of their physician-patient privilege once they become a witness in a criminal domestic-abuse prosecution, a chilling effect will be cast over the reporting of domestic abuse, the disclosure of information to treatment providers by victims, the ability of physicians and psychotherapists to treat psychological disorders arising from domestic abuse, and the willingness of victims to testify against their abusers. The relevancy test of the majority fails to consider the impact of simple relevancy-based disclosure on society in general.

Finally, the holding of the majority deprives victims of domestic abuse crimes, and perhaps other victims of crimes, of a constitutional right of privacy without an opportunity to show how the deprivation of the right will impact their privacy interest. The victim is treated as if the right to privacy does not apply to judges, court staff, attorneys, defendants, and other people connected to the court system.

The majority has, without explanation, decided to paint with broad brushstrokes by making an implicit judgment that the presence of potentially relevant records trumps confidentiality in the context of a criminal prosecution. Even though this judgment may be justified in many cases, it is not a justification to paint with a broad brush. Justice within a case involving strong competing constitutional interests requires

a careful analysis of the particular facts and circumstances. Experience reveals that a one-size-fits-all test can present a serious risk of injustice in a particular case. This case may very well be one. Sadly, without an opportunity to fully explore all the compelling interests at stake, this will never be known.

The new test developed by the majority may be easy and beneficial to defendants, but it is a step back both for victims and for the progress made in addressing domestic violence over the last decade. The only way victims of domestic abuse with a history of counseling will be able to ensure the confidentiality of their private counseling records is to not report domestic abuse. The law should be able to do better.